# ATTACHMENT A

# HEARN, BRITTAIN & MARTIN, P.A.

### ATTORNEYS AT LAW
4614 OLEANDER DRIVE
MYRTLE BEACH, SOUTH CAROLINA 29577

843-449-8562 ▪ FAX # 843-497-6124
www.hbmlawfirm.com

GEORGE M. HEARN, JR.
THOMAS C. BRITTAIN
L. MORGAN MARTIN
G. SCOTT BELLAMY
PETER L. HEARN, SR.
NATASHA M. HANNA

CONWAY OFFICE
1206 THIRD AVENUE
CONWAY, SC 29526
843-248-3172
FAX # 843-248-4911

May 22, 2007

## VIA FACSIMILE and EMAIL

Edward R. Cole
Turner, Padget, Graham, & Laney, P.A.
P.O. Box 2116
Myrtle Beach, SC 29578

Re:    *CAMG, LLC vs. AmSol, LLC, et. al.*

Dear Ed:

I am writing this letter to formally notify you that a hearing has been scheduled for tomorrow May 23, 2007 at 5:00pm before the Honorable John L. Breeden at the Horry County Courthouse. The purpose of this hearing is for CAMG to obtain a Temporary Restraining Order to allow the physicians of CAMG to continue to practice at GSRMC. At that time, I also intend to request a hearing for a Temporary Injunction seeking the same relief.

In response to your letter that I received this afternoon, please note that I did not represent to you that I was not filing any documents in connection with the TRO. In fact, it is my understanding that I am required to file a Motion and associated pleadings in order to obtain the relief that I am requesting. I was not able to do so until today because it was not clear who should be named as Defendants. Once I was able to determine the appropriate parties, I finalized the pleadings and filed the documents today at the Horry County Courthouse. I have enclosed a copy of those documents with this letter and email.

Please let me know if you or any other person intends to appear at the hearing tomorrow.

With kind regards, I am

Very truly yours,

Natasha M. Hanna

NMH:pms

Enclosure

cc:    Jack Thomas, Esq.
       Dominic Starr, Esq.
       Henrietta Golding, ESq.

| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS IN THE FIFTEENTH JUDICIAL CIRCUIT |
|---|---|---|
| COUNTY OF HORRY | ) | |
| | ) | CIVIL ACTION COVER SHEET |
| Coastal Anesthesia Medical Group, LLC, | ) | |
| **Plaintiff(s),** | ) | |
| vs. | ) | |
| | ) | 2007-CP-26- 3027 |
| | ) | |
| Anesthesia Management Solutions, LLC, n/k/a AmSol, LLC, American Integrated Management, LLC, James W. Cottrell, and Richard Snow, | ) | |
| **Defendant(s).** | ) | |

| Submitted By: Natasha M. Hanna | | SC Bar #: 70198 |
|---|---|---|
| HEARN, BRITTAIN & MARTIN, P.A. | | Telephone #: [843] 449-8562 |
| Address: 4614 Oleander Drive | | Fax #: [843] 497-6124 |
| Myrtle Beach, SC 29577 | | Other: [843] 602-1109 |
| | | E-mail: nhanna@sc.rr.com |

COPY

NOTE: The cover sheet and information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is required for the use of the Clerk of Court for the purpose of docketing. It must be filled out completely, signed, and dated. A copy of this cover sheet must be served on the defendant(s) along with the Summons and Complaint.

## DOCKETING INFORMATION *(Check all that apply)*

*\*If Action is Judgment/Settlement do not complete*

X   JURY TRIAL demanded in complaint.   ☐ NON-JURY TRIAL demanded in complaint.

☐   This case is subject to **ARBITRATION** pursuant to the Circuit Court Alternative Dispute Resolution Rules.

X   This case is subject to **MEDIATION** pursuant to the Circuit Court Alternative Dispute Resolution Rules.

☐   This case is exempt from ADR (certificate attached).

## NATURE OF ACTION *(Check One Box Below)*

| Contracts | Torts - Professional Malpractice | Torts – Personal Injury | Real Property |
|---|---|---|---|
| ☐ Constructions (100) | ☐ Dental Malpractice (200) | ☐ Assault/Slander/Libel (300) | ☐ Claim & Delivery (400) |
| ☐ Debt Collection (110) | ☐ Legal Malpractice (210) | ☐ Conversion (310) | ☐ Condemnation (410) |
| ☐ Employment (120) | ☐ Medical Malpractice | ☐ Motor Vehicle Accident | ☐ Foreclosure (420) |
| ☐ General (130) | ☐ Other (299) | ☐ Premises Liability (330) | ☐ Mechanic's Lien (430) |
| X Breach of Contract (140) | | ☐ Products Liability (340) | ☐ Partition (440) |
| ☐ Other (199) | | ☐ Personal Injury (350) | ☐ Possession (450) |
| | | ☐ Other (399) Wrongful Death | ☐ Building Code Violation (460) |
| | | | ☐ Other (499) |

| Inmate Petitions | Judgments/Settlements | Administrative Law/Relief | Appeals |
|---|---|---|---|
| ☐ PCR (500) | ☐ Death Settlement (700) | ☐ Reinstate Driver's License (800) | ☐ Arbitration (900) |
| ☐ Sexual Predator (510) | ☐ Foreign Judgment (710) | ☐ Judicial Review (810) | ☐ Magistrate-Civil (910) |
| ☐ Mandamus (520) | ☐ Magistrate's Judgment | ☐ Relief (820) | ☐ Magistrate-Criminal (920) |
| ☐ Habeas Corpus (530) | ☐ Minor Settlement (730) | ☐ Permanent Injunction (830) | ☐ Municipal (930) |
| ☐ Other (599) | ☐ Transcript Judgment | ☐ Forfeiture (840) | ☐ Probate Court (940) |
| | ☐ Lis Pendens (750) | ☐ Other (899) | ☐ SCDOT (950) |
| | ☐ Other (799) | | ☐ Worker's Comp (960) |
| | | | ☐ Zoning Board (970) |
| | | | ☐ Administrative Law Judge (980) |

| Special/Complex /Other | | | Appeals |
|---|---|---|---|
| ☐ Environmental (600) | ☐ Pharmaceuticals (630) | | ☐ Public Service Commission (990) |
| ☐ Automobile Arb. (610) | ☐ Unfair Trade Practices (640) | | ☐ Employment Security Comm (991) |
| ☐ Medical (620) | ☐ Other (699) | | ☐ Other (999) |

FILED HORRY COUNTY 2007 MAY 22 PM 1:59

Submitting Party Signature: *Natasha Hanna*  Date: _____May 22, 2007_____

**Note:** Frivolous civil proceedings may be subject to sanctions pursuant to SCRCP, Rule 11, and the South Carolina Frivolous Civil Proceedings Sanctions Act, S.C. Code Ann. §15-36-10 et. seq.

## OR MANDATED ADR COUNTIES ONLY
### Florence, **Horry**, Lexington, Richland, Greenville**, and Anderson**
### ** Contact Respective County Clerk of Court for modified ADR Program Rules

SUPREME COURT RULES REQUIRE THE SUBMISSION OF ALL CIVIL CASES TO AN ALTERNATIVE DISPUTE RESOLUTION PROCESS, UNLESS OTHERWISE EXEMPT.

#### You are required to take the following action(s):

1. The parties shall select a neutral within 210 days of filing of this action, and the Plaintiff shall file a "Stipulation of Neutral Selection" on or before the 224th day after the filing of the action. If the parties cannot agree upon the selection of the neutral within 210 days, the Plaintiff shall notify the Court by filing a written "Request for the Appointment of a Neutral" on or before the 224th day after the filing of this action. The Court shall then appoint a neutral from the Court-approved mediator/arbitrator list.

2. The initial ADR conference must be held within 300 days after the filing of the action.

3. Case are exempt from ADR only upon the following grounds:

a. Special proceeding, or actions seeking extraordinary relief such as mandamus, habeas corpus, or prohibition;

b. Cases which are appellate in nature such as appeals or writs of certiorari;

c. Post Conviction relief matters;

d. Contempt of Court proceedings;

e. Forfeiture proceedings brought by the State;

f. Cases involving mortgage foreclosures; and

g. Cases that have been submitted to mediation with a certified mediator prior to the filing of this action.

4. Motion of a party to be exempt from payment of neutral fees due to indigency should be filed with the Court within ten (10) days after the ADR conference had been concluded.

**Please Note:** **You must comply with the Supreme Court Rules regarding ADR.**
**Failure to do so may affect your case or may result in sanctions.**

STATE OF SOUTH CAROLINA    )    IN THE COURT OF COMMON PLEAS
                )    FIFTEENTH JUDICIAL CIRCUIT
COUNTY OF HORRY    )

CIVIL ACTION NUMBER: 2007-CP-26-*3027*

Coastal Anesthesia Medical Group, LLC, )

            Plaintiff,    )

vs.    )    **SUMMONS**

Anesthesia Management Solutions, LLC, )
n/k/a AmSol, LLC, American Integrated )
Management, LLC, James W. Cottrell, )
and Richard Snow, )

            Defendants.    )

**TO THE DEFENDANTS ABOVE NAMED:**

    YOU ARE HEREBY SUMMONED AND REQUIRED to answer the Complaint in this action, of

which a copy is herewith served upon you, and to serve a copy of your answer to said Complaint on the below

subscribed attorney, Natasha M. Hanna, Esq., at her office at 4614 Oleander Drive, Myrtle Beach, South

Carolina, 29577, within thirty (30) days after the service hereof, exclusive of the day of such service; and if

you fail to answer the Complaint within the time aforesaid, the Plaintiff in this action will apply to the Court

for the relief demanded in this action.

                   Natasha M. Hanna, Esq., Attorney for the Plaintiff
                   **HEARN, BRITTAIN & MARTIN, P.A.**
                   4614 Oleander Drive
                   Myrtle Beach, SC  29577
                   Voice: [843] 449-8562
                   Fax:   [843] 497-6124

May 22, 2007
Myrtle Beach, SC

STATE OF SOUTH CAROLINA    )    IN THE COURT OF COMMON PLEAS
                           )    FIFTEENTH JUDICI AL CIRCUIT
COUNTY OF HORRY            )    CASE NO. _____

Coastal Anesthesia Medical Group, LLC,    )
                                          )
           Plaintiff,                     )
                                          )
                                          )
    vs.                                   )           COMPLAINT
                                          )       (Jury Trial Requested)
Anesthesia Management Solutions, LLC,     )
n/k/a AmSol, LLC, American Integrated     )
Management, LLC, James W. Cottrell,       )
and Richard Snow.                         )
                                          )
           Defendants.                    )
_____    )

The Plaintiff, Coastal Anesthesia Medical Group, LLC, ("CAMG") alleges as follows:

1.    Plaintiff is a Limited Liability Company organized and existing under the laws of the State

      of South Carolina with its principal place of business in Horry County, South Carolina.

2.    On information and belief, Defendant Anesthesia Management Solutions, LLC n/k/a AmSol,

      LLC ("AmSol") is a limited liability company organized and existing under the laws of the

      State of North Carolina and is doing business as "AmSol" in the County of Horry, State of

      South Carolina.

3.    On information and belief, Defendant American Integrated Management, LLC ("AIM") is a

      limited liability company organized and existing under the laws of the State of North

      Carolina and is doing business as "AIM" in the County of Horry, State of South Carolina.

4.    On information and belief, Defendant James W. Cottrell is a citizen and resident of the State

      of Ohio, but maintains a residence in North Carolina, and is a 94% member of AmSol and

      a 100% member of AIM.

5.    On information and belief, Defendant Richard Snow is a citizen and resident of the State of North Carolina and is a 3% member of AmSol and the legal counsel and Chief Executive Officer to AmSol and AIM.

6.    At all times subject to this matter, the parties entered contracts in Horry County, South Carolina and performed services relating thereto in Horry County, South Carolina. Therefore, jurisdiction is proper in this court.

## FACTS:

7.    Plaintiff CAMG is a company that provides professional anesthesia services to physicians and hospitals  and consists of three members and one employee who are licensed anesthesiologists.

8.    Defendant AmSol is a company that helps hospitals secure and manage anesthesiologists.

9.    On September 24, 2001, AmSol entered an agreement with Grand Strand Regional Medical Center entitled "Anesthesia Services and Management Agreement" (ASMA), attached as Exhibit A, which required AmSol to provide Anesthesia services to GSRMC.  AmSol can provide such services only contracting with licensed professionals or companies (such as Plaintiff) employing licensed professionals..

10.    The term of the ASMA was for five years. It provided ". . . (E)ither party may terminate this agreement at the end of the term of the agreement or renegotiate a new agreement."

11.    On September 28, 2001, CAMG entered a contract entitled "Management Services Agreement" ("MSA"), attached as Exhibit B, with Defendant AmSol whereby CAMG became the exclusive provider of anesthesia services at Grand Strand Regional Medical Center and AmSol became the exclusive provider of management services to CAMG.

12.     The term of said contract was for five years at which time it self-renewed and does not expire until September 28, 2011.

13.     CAMG provided excellent quality anesthesia services during the term of the contract and has established an impeccable reputation among the physicians and patients at GSRMC.

14.     CAMG has continued to provide anesthesia services pursuant to their contract.

15.     The term of the ASMA between AmSol and GSRMC expired on September 24, 2006.  After the expiration date, AmSol, GSRMC and CAMG continued to function in accordance with the terms of the ASMA and the MSA while AmSol, through its corporate counsel and Chief Executive Officer, Rick Snow, and its majority member, James W. Cottrell, undertook to negotiate an extension of the ASMA Agreement.  (See email from AmSol general counsel to CAMG Manager, Joseph Maggioncalda, (attached hereto as Exhibit C.)

16.     Subsequently, however, AmSol and its majority member, James Cottrell, formed a new LLC (AIM) and executed a new contract for anesthesia services with GSRMC which was executed on February 16, 2007.  The new contract was for the same services previously provided to GSRMC by AmSol under the AMSA.

17.     Upon information and belief, Cottrell is the 94% owner of AmSol and now the 100% owner of AIM.

18.     Upon information and belief, Cottrell formed AIM to defraud CAMG and others and to attempt to rid AmSol of any obligations that it had under its existing contracts and obligations with CAMG and others.  (See email from AmSol Chief Executive Officer to CAMG's managing member hereto attached as Exhibit D.)

19.     The acts of James Cottrell and AmSol in forming a new company that is the alter-ego of

Page 3 of 9

AmSol is an act to defraud its creditors and those to which it has obligations. Said acts are further in breach of the obligation of good faith owed by Amsol to CAMG.

20. On or about April 23, 2007, AmSol sent a letter to CAMG giving notice of termination of its contract with CAMG effective at 11:59pm. On May 23, 2007.

21. AmSol stated that because its contract with GSRMC had ended that it was now exercising its right to terminate its contract with CAMG.

22. AmSol's acts and James Cottrell's acts are fraudulent in that they created the very situation which they now attempt to rely on by executing the contract with GSRMC in the name of the new LLC (AIM) instead of AmSol.

23. Further, AmSol and James Cottrell breached their contract and their duty of good faith and fair dealing by executing the contract with GSRMC under the name of its alter ego, AIM, when it was obligated to under its existing contract with CAMG.

24. During the time between the expiration of AmSol's contract with GSRMC and the time that AIM entered a contract with GSRMC, AmSol, Cottrell and Snow attempted to intimidate, control, force, and demand CAMG to do things that were contrary to the parties agreement and contrary to the CAMG Operating Agreement.

25. Further, Snow made comments about CAMG and its members by making false accusations of theft and fraud.

26. If AmSol/A\IM is permitted to terminate CAMG's anesthesia services to GSRMC, CAMG will suffer immediate and substantial damages for which it has no adequate remedy at law.

## FOR A FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
#### (As to Defendant AmSol and Cottrell)

27.    Plaintiffs reallege the above paragraphs as if repeated herein verbatim..

28.    Plaintiffs have at all times performed all of its obligations under the terms of the agreement between Plaintiff and Defendant AmSol.

29.    Defendant AmSol has breached the terms and provisions of the "MSA," both oral and written, between Plaintiff and Defendant AmSol by wrongfully terminating the agreement with the Plaintiff and by causing the agreement for anesthesia services with GSRMC to be executed with AIM instead of AmSol.

30.    Because of Defendant's breaches, Plaintiff has suffered and will suffer damages, including lost income, lost patients, lost economic opportunities, and lost reputation and goodwill..

31.    As a direct and proximate result of Defendant AmSol's breaches, Plaintiff has been damaged and will be damaged in an amount to be proven at trial.

32.    WHEREFORE, Plaintiff prays for judgment as set forth below.

## FOR A SECOND CAUSE OF ACTION
### BREACH OF CONTRACT ACCOMPANIED BY FRAUDULENT ACT
#### (As to Defendant AmSol and Cottrell)

33.    Plaintiff realleges the above paragraphs as if repeated herein verbatim.

34.    Defendant AMSol's breach of the agreement as set forth above was accompanied by a fraudulent act in causing the contract with GSRMC to be executed with AIM for the purpose of ridding itself of any obligations that it had with other persons or entitites and attempt to defraud creditors.

35.    WHEREFORE, Plaintiff prays for judgment as set forth below.

**FOR A THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED GOOD FAITH AND FAIR DEALING**
(As to Defendant AmSol)

36.   Plaintiff realleges the above paragraphs as if repeated verbatim herein.

37.   Defendant owed a duty of good faith and fair dealing to Plaintiff which was a duty implied in the various contracts between Defendant and Plaintiff, in their five-year course of dealing and thereafter, and by Plaintiffs' justifiable reliance on Defendant's repeated representations during that time.

38.   The duty of good faith and fair dealing required Defendant to refrain from taking any action which would deprive Plaintiff of the benefits to which it was entitled under the "MSA"

39.   Plaintiffs are informed and believe, and thereon allege that Defendant acted in bad faith by engaging in inherently deceptive conduct in a calculated attempt to circumvent and defeat the terms and purpose of the "MSA" and to circumvent its obligations to other persons or entities.

40.   As a direct and proximate result of Defendant's conduct, Plaintiffs have been damaged and will be damaged in an amount to be proven at trial.

41.   WHEREFORE, Plaintiff prays for judgment as set forth below.

**FOR A FOURTH CAUSE OF ACTION**
**( TORTUOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP)**
(Cottrell, Snow and AIM)

42.   The preceding paragraphs are incorporated by reference as if fully set out below.

43.   A contract existed between AmSol and CAMG as well as a contract between CAMG and its members.

44.   Defendants AIM, Cottrell, and Snow knew of these contractual obligations and intentionally

Page 6 of 9

interfered with these contracts by electing to contract with GSRMC for anesthesia services as AIM and not AmSol.

45.    Defendants AIM, Cottrell and Snow were without justification in doing these acts and further had a duty to CAMG not to interfere with its business relationships or do anything to the detriment of CAMG.

46.    Plaintiff has suffered damages resulting from the Defendants Cottrell, Snow and AIM's causing AmSol to discontinue its contract with GSRMC for anesthesia services.

47.    WHEREFORE, Plaintiff prays for judgment as set forth below.

### FOR A FIFTH CAUSE OF ACTION
### INTENTIONAL INTERFERENCE WITH
### PROSPECTIVE ECONOMIC ADVANTAGE
### (As to Defendant AmSol, Cottrell, Snow and AIM)

48.    Plaintiff realleges the above paragraphs as if repeated herein verbatim.

49.    CAMG has established economic relationships with many physicians who relied on and utilized the services of CAMG.

50.    Defendant was aware of these economic relationships and of the financial benefits of these relationships to CAMG.

51.    Defendant and its agents acted intentionally to interfere with these economic relationships, as alleged in this complaint.

52.    As a direct and proximate result of this wrongful conduct, Plaintiff has and will be deprived of substantial income and has suffered direct, consequential, and accidental damages in an amount to be proven at trial.

53.    Defendant willingly, knowingly, and maliciously planned to harm Plaintiff's business.

54.    Pursuant to such plans, and in furtherance of it, Defendant committed the acts mentioned

herein.

55.  The acts evidencing this plan are continuing as Defendant is sending letters to Plaintiff and communicating with others about its terminating its relationship with Plaintiff.

56.  Unless restrained by this Court, Defendant will continue its wrongful acts, thus engendering a multiplicity of legal proceedings. Pecuniary compensation will not afford Plaintiffs adequate relief for the damages to its good name in the public perception and business world or the irreparable injury to its goodwill.

57.  Defendant's acts were a complete and conscious disregard of the consequences they might have on Plaintiffs, and therefore fully justify awarding Plaintiffs exemplary and punitive damages in an amount to be established at trial.

58.  WHEREFORE, Plaintiffs pray for judgment as set forth below.

## FOR A SIXTH CAUSE OF ACTION
### DEFAMATION

59.  Plaintiffs reallege the above paragraphs as if repeated herein verbatim.

60.  The Defendant's conduct and statements regarding Plaintiff and Plaintiff's members are disparaging and defamatory because they willfully and without justification or privilege convey to other persons (including Plaintiff's colleagues) statements that the company and several of its members misappropriated money and that it is terminating its relationship with CAMG.

61.  Defendant's statements were false.

62.  Defendant's statements have a tendency to injure Plaintiffs and its members in its occupation because as a proximate result of Defendant's publication of these statements, prospective business relationships have suffered, and Plaintiffs have accordingly suffered injury to their

business and suffered pecuniary loss in an amount to be determined at trial.

63.    Defendant's statements, as set forth above, were oppressive, fraudulent or malicious, such that they warrant both compensatory and punitive damages.

64.    WHEREFORE, Plaintiff prays for judgment as set forth below.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1.    For an injunction preventing any further interference by Defendants with Plaintiffs' business or with Plaintiffs' ability to provide anesthesia services;

2.    For actual damages according to proof at trial;

3.    For punitive damages;

4.    For cost of suit incurred, including but not limited to reasonable attorneys' fees; and

5.    For such other and further relief as this Court may deem just and proper.

HEARN, BRITTAIN & MARTIN, P.A.
Attorneys for the Plaintiff

*Natasha Hanna*

Natasha M. Hanna
4614 Oleander Drive
Myrtle Beach, SC 29577
(843) 448-8562

May 22, 2007
Myrtle Beach, South Carolina

Page 9 of 9

**Exh A**

THIS AGREEMENT CONTAINS A BINDING, IRREVOCABLE
AGREEMENT TO ARBITRATE AND IS SUBJECT TO ARBITRATION
PURSUANT TO TITLE 15, CHAPTER 48 (UNIFORM ARBITRATION ACT)
OF THE CODE OF LAWS OF SOUTH CAROLINA

## ANESTHESIA SERVICES AND MANAGEMENT AGREEMENT

WHEREAS, the parties hereto desire to enter into an Anesthesia Services and Management Agreement ("Agreement"), effective on the date noted on the signature page hereof;

WHEREAS, the parties hereto are Grand Strand Regional Medical Center, L.L.C. d/b/a Grand Strand Regional Medical Center ("Hospital"), domiciled in Myrtle Beach, South Carolina, and Anesthesia Management Solutions, L.L.C., an anesthesia management company (Management Company"), domiciled in High Point, North Carolina;

WHEREAS, Hospital desires the highest standards in the operation of its Department of Anesthesia and continuous and uninterrupted coverage in the Department according to the usual and customary standards for the provision of non-cardiac anesthesiology services; and

WHEREAS, Hospital desires to retain Management Company to help secure and manage Anesthesiologists to support the operations of the Anesthesia Department;

WHEREAS, Hospital concludes that an exclusive relationship in the provision of anesthesia services will best facilitate the delivery of efficient, effective, and quality patient care, and such a relationship is expected to improve the relationships between the Anesthesia Department, the Medical Staff and other services of the Hospital, afford effective utilization of the Hospital's equipment, provide consistent service and quality control, provide prompt availability of professional services, simplify scheduling of patients and physician coverage, and enhance the efficient and effective administration of anesthesia services, all of which enhance the quality of patient care;

NOW THEREFORE, in consideration of the foregoing covenants and such other good and valuable consideration as is set forth herein, sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1.  **DUTIES, PRIVILEGES, AND PERFORMANCE OF MANAGEMENT COMPANY**

    a.  Management Company represents and warrants that it is a Limited Liability Company organized and validly existing under the laws of the State of North Carolina, and authorized to engage in the profession of Management Services and authorized to do business in the State of South Carolina.

    b.  Management Company shall secure and provide Anesthesiologists and Certified Registered Nurse Anesthetists ("CRNA") for the coverage of all Anesthesia Services ("Services") at the Hospital, except cardiac anesthesiology. Management Company shall assume complete responsibility for the professional operation of the Service and shall provide all professional services that Hospital requires to be provided through this Agreement; provided that, Management Company shall not be responsible for those items which are precluded by laws in the State of South Carolina prohibiting the corporate practice of medicine.

    c.  "Services" shall be defined as all Anesthesia Services, including on call coverage for surgical and obstetrical patients, and pain management for hospital inpatients and ASC surgical patients. Cardiac anesthesia is expressly excluded from this Agreement.

    d.  No Anesthesiologist or CRNA may provide Services for Hospital without the express written consent of the Management Company.

    e.  All CRNAs shall provide Services under the medical supervision of the Anesthesiologists secured by Management Company for the duration of this Agreement, unless approved in writing by Management Company.

f.      Management Company agrees that all Anesthesiologists and CRNAs who provide services under this Agreement will agree, individually and in writing to be bound by all terms of this Agreement.

g.      Management Company shall not have any actual clinical responsibilities, as all clinical responsibilities shall be the responsibility of the Anesthesiologists and CRNAs provided by Management Company. However, Management Company will be responsible for assuring that all services are provided as mentioned in this Agreement.

h.      With regard to management functions, Management Company shall:

(1) recruit sufficient Anesthesiologists and CRNAs to staff the current number of operating rooms ("OR") with the expectation that they will meet all the anesthesiology needs of the Hospital, as mentioned in Section 1.b.;

(2) provide Anesthesiologists and CRNAs whose qualifications meet standards set forth in Section 4;

(3) provide a sufficient number of Anesthesiologists and CRNAs to perform as many surgeries as required by the surgeons and Hospital: provided that, if Hospital's decision requires Management Company to hire anesthesiologists or pay CRNAs which it cannot reasonably afford to do, Management Company shall have the right to terminate the contract within 30 days notice; and further provided that, if Hospital desires to expand the amount or type of coverage provided, Hospital must give Management Company 30 days notice. If additional services are determined necessary beyond those required in this Agreement, an addendum shall be executed to cover those services and the payment thereof. No change in services shall be requested in the first year of the Agreement.

(4) assist in designing an appropriate anesthesia record, an appropriate Superbill, an appropriate Charge Ticket, and such other documents as are appropriate;

(5) assure that Anesthesiologists and CRNAs have appropriate provider numbers and other documents necessary for industry standard billing and collections;

(6) provide or assure that Anesthesiologists and CRNAs have competent accounting services, including payroll services, placement of insurance, receiving monies from government and commercial payors, depositing funds, writing checks for expenses, preparing necessary group (but not individual) income tax return information in the form of W-2's, 1099's, and K-1's disseminating monthly financial reports, setting up checking accounts, and such other accounting services as are necessary for appropriate management services and necessary for appropriate billing and collection services;

(7) Negotiate in good faith for participation by Anesthesiologists and CRNAs in such programs and/or networks in which Hospital may participate with health maintenance organizations, preferred provider organizations, other payors, and physician-hospital organizations. Hospital agrees to assist Management Company in negotiating terms of participation. However, Hospital will not require Management Company, Anesthesiologists and/or CRNAs to accept a greater discount than Hospital accepts. If Management Company, Anesthesiologists, or CRNAs fail to agree to the terms of participation and, as a result thereof, Hospital is threatened with exclusion or expulsion from the network or program or reduced compensation for its services, then Hospital may immediately terminate, pursuant to the notice and cure provisions hereof, the exclusive provisions of this Agreement and/or further terminate the Agreement in its entirely.

(8) assist in credentialing and licensing Anesthesiologists and CRNAs provided by Management Company;

(9) assure accurate and appropriate billing and documentation compliance, including periodic compliance audits as recommended by HCA or the Office of Inspector General;

(10) prepare such administrative and business records and reports related to the Service in such format and upon such intervals as Hospital shall reasonably require;

(11) inform Hospital of any other arrangements which Management Company, Anesthesiologists, or CRNAs have that may present a conflict of interest or materially interfere in Management Company or its agents' performance of its duties under this Agreement. In the event Management Company, Anesthesiologists, or CRNAs pursues conduct which does, in fact, constitute a conflict of interest or which materially interferes with performance under this Agreement, or if the conduct is reasonably anticipated to interfere with performance under this Agreement, then Management Company must provide Hospital thirty (30) days notice prior to engaging in possible conflict and if it cannot be resolved to Hospital's satisfaction within said thirty (30) days, then Hospital may terminate this Agreement with sixty (60) days notice.

(12) assure that no part of the premises of the Hospital shall be used at any time as an office for private practice and delivery of care for non-Hospital patients. This provision shall not, however, be construed as prohibiting Management Company, Anesthesiologists, or CRNAs from maintaining an office for private practice at any professional building owned by Hospital or any of its affiliates.

(13) assure that neither Management Company, Anesthesiologists, nor CRNAs shall have the right or authority to enter into any contract in the name of the Hospital or otherwise bind Hospital in any way.

(14) shall have the right of first refusal to provide Anesthesiologists or CRNAs to perform all Services at Hospital and at any inpatient and/or outpatient facility or other future off-campus venture and/or facilities; provided that, this right of first refusal shall not apply to facilities where Hospital owns less than 51% of the ownership or control of the facility, and this right of first refusal shall not apply to Hospital's existing ambulatory surgical centers. If Management Company's Anesthesiologists engage in any pain management practice, other than Hospital inpatients or ASC surgical patients, any income guarantee to the Management Company for the Anesthesiologists or to the Anesthesiologists themselves will cease immediately, and the payback provision is immediately invoked.

(15) may not be discharged by Hospital except for cause as specified herein, or at the end of the term of this Agreement.

(16) indemnify, defend and hold Hospital harmless from and against any and all claims for wages, salaries, benefits, taxes and all other withholdings and charges payable to, or in respect to, Management Company, its employees, Anesthesiologists, or CRNAs for Services provided in this Agreement.

2. COMPENSATION

a.    Compensation between Hospital and Management Company shall be detailed in Exhibits 1, 2, and 3.

3. PROFESSIONAL SERVICES AND QUALIFICATIONS

a.    Management Company shall separately contract with a limited liability company employing or contracting with Anesthesiologists and CRNAs wherein the obligations of the Anesthesiologists and CRNAs herein shall be assumed in that agreement, which agreement shall also provide that the failure of any Anesthesiologist or CRNA to meet the qualifications, perform the Services or honor any section of this Agreement set forth herein shall constitute cause for Hospital CEO, in his discretion, to require

Anesthesia Services and Management Agreement                                    Page 3

that Management Company prohibit any one or all of the Anesthesiologists or CRNAs from working under this Agreement. Moreover, any reference in this Agreement to obligations, responsibilities, or qualifications of Anesthesiologists or CRNAs that are not fulfilled shall constitute cause for termination of Management Company by Hospital.

b.  Qualifications of Anesthesiology Providers.  All Anesthesiologists providing Services hereunder must (i) hold and maintain a currently valid and unlimited license to practice medicine in South Carolina, (ii) hold and maintain eligibility for certification or a certification by the American Board of Anesthesiology, (iii) acquire and maintain membership in good standing as a member of the Hospital Medical Staff subject to the Hospital Rules and Regulations and Medical Staff Bylaws pertaining to Medical Staff, (iv) acquire and maintain professional liability coverage at the levels specified in Section 5, (v) hold and maintain a valid state and federal DEA registration number; and (vi) represents and warrants to Hospital that Anesthesiologist 1) is not currently excluded, debarred, or otherwise ineligible to participate in the Federal health care programs as defined in 42 U.S.C. Section 1320a-7b(f) (the "Federal health care programs"); (2) is not convicted of a criminal offense related to the provision of health care items or services but has not yet been excluded, debarred, or otherwise declared ineligible to participate in the Federal health care programs, and 3) is not under investigation or otherwise aware of any circumstances which may result in Anesthesiologist being excluded from participation in the Federal health care programs. This shall be an ongoing representation and warranty during the term of this Agreement and Anesthesiologist shall immediately notify Hospital of any change in the status of the representation and warranty set forth in this section. Any breach of this section shall give Hospital the right to terminate this Agreement immediately for cause.

c.  Qualifications of Certified Registered Nurse Anesthetists.  All CRNAs providing Services hereunder must (i) be licensed as a Registered Nurse in South Carolina, (ii) meet all the licensure requirements imposed upon CRNAs under the laws, rules, and regulations of said state, (iii) have graduated from a nurse anesthesia educational program that meets standards of the Council on Accreditation of Nurse Anesthesia, (iv) have passed a certification exam of the Council on Certification of Nurse Anesthetists or by the Council on Recertification of Nurse Anesthetists, (v) maintain staff privileges at Hospital if Hospital grants such privileges to CRNAs, and abide by all Hospital Policies and Procedures governing Services or CRNAs, (vi) acquire and maintain professional liability coverage at the levels specified in Section 5, (vii) represents and warrants to Hospital that CRNA 1) is not currently excluded, debarred, or otherwise ineligible to participate in the Federal health care programs as defined in 42 U.S.C. Section 1320a-7b(f) (the "Federal health care programs"); (2) is not convicted of a criminal offense related to the provision of health care items or services but has not yet been excluded, debarred, or otherwise declared ineligible to participate in the Federal health care programs, and 3) is not under investigation or otherwise aware of any circumstances which may result in CRNA being excluded from participation in the Federal health care programs. This shall be an ongoing representation and warranty during the term of this Agreement and Anesthesiologist shall immediately notify Hospital of any change in the status of the representation and warranty set forth in this section. Any breach of this section shall give Hospital the right to terminate this Agreement immediately for cause.

d.  Anesthesia Services.  All Services shall be performed in accordance with the Hospital and Medical Staff policies, bylaws, procedures, protocols, practices, and standards.  Hospital shall inform the Management Company or Anesthesiologists and CRNAs of Hospital Policies on a need-to-know basis. All Services shall be performed in accordance with (i) all professional and ethical standards applicable to Anesthesiologists and CRNAs, (ii) any standard, ruling, or regulation of the Joint Commission of Accreditation of Healthcare Organizations, (iii) all applicable federal, state, and local laws or regulations, including those of the Medicare and Medicaid programs and third party payors, (iv) the HCA Corporate Integrity Agreement, and (v) this Agreement.

e.  Scheduling of Services.  Management Company shall assure a sufficient number of anesthesiologists or CRNAs to cover the expected volume of patients receiving Services at Hospital including the provision

of 24 hour anesthesiologist call coverage, and including Obstetrical coverage. Hospital and Management Company shall meet at either party's request, to review the adequacy of coverage provided by the Anesthesiologists and CRNAs.

f.) <u>Administrative Services</u>. The Director of the Anesthesiology Department ("Medical Director") shall be chosen from the anesthesiologists whose services are provided under this Agreement by Hospital CEO after discussion with Management Company. The Medical Director's compensation and administrative services shall be enumerated in Exhibit 2 .

g.) <u>Participation in Meetings and Programs</u>. The Anesthesiologists and CRNAs shall participate in Medical Staff meetings, Hospital educational and compliance programs, quality improvement programs, and such other matters as required by Hospital Policies, Medical Staff Bylaws, Rules or Regulations, or as requested by the CEO.

5.    <u>INSURANCE.</u>

a.    <u>Anesthesiologist Coverage</u>. During the term of this Agreement the Management Company will require that the Anesthesiologists procure and maintain occurrence or claims made professional liability insurance coverage in the minimum amount of $1 million per occurrence or per claim and $3 million annual aggregate coverage for all Anesthesiologists; provided that, those providers who have Joint Underwriting Association of South Carolina coverage in the amount of $200,000/$400,000 with an unlimited umbrella through the Patients Compensation Fund may maintain that coverage as sufficient hereunder. The amount of coverage may be increased if required by the Medical Staff's policies and procedures for all hospital based physicians. Such insurance shall continue throughout the term of this Agreement; and upon termination of this Agreement, or the expiration of cancellation of the insurance, Anesthesiologist shall purchase, or arrange for the purchase of, either (i) an extended reporting endorsement ("Tail Coverage") for the maximum period that be purchased from its insurer (ii) "Prior Acts" coverage from the new insurer with a retroactive date on or prior to the date Anesthesiologists began performing Services at Hospital or (iii) maintain continuous coverage with the same carrier for the period of the statute of limitations for personal injury. In the event Management Company is unable to assure that the Anesthesiologists have obtained, or the Anesthesiologists are unable to obtain, the required insurance for or on behalf of any Anesthesiologists providing services to the Hospital, Hospital shall require each Anesthesiologist to keep and maintain such insurance coverage individually. All such insurance shall be kept and maintained without cost or expense to Hospital. In the event the Anesthesiologists have not purchased the required coverage or the Management Company fails to assure that Anesthesiologists have obtained the required coverage, Hospital, in addition to any other rights it may have under the terms of this Agreement or under law, shall be entitled, but not obligated, to purchase coverage. Hospital shall be entitled to immediate reimbursement from Management Company or Anesthesiologists for the cost thereof. Hospital may enforce its right of reimbursement through set-off against any sums otherwise payable to Management Company. Management Company or Anesthesiologists shall provide Hospital with a certificate or certificates of insurance certifying the existence of all coverages required hereunder. Management Company and Anesthesiologists shall request its or their insurance carriers to provide Hospital with not less than thirty (30) days prior written notice in the event of a change in the professional liability policies of Anesthesiologists.

b.    <u>CRNA Coverage</u>. During the term of this Agreement the Management Company will require that the CRNAs procure and maintain occurrence or claims made professional liability insurance coverage in the minimum amount of $1 million per occurrence or per claim and $3 million annual aggregate coverage for all CRNAs; provided that those providers who have Joint Underwriting Association of South Carolina coverage in the amount of $200,000/$400,000 with an unlimited umbrella through the

Patients Compensation Fund may maintain that coverage as sufficient hereunder.  The amount of coverage may be increased if required by the Medical Staff's policies and procedures. Such insurance shall continue throughout the term of this Agreement; and upon termination of this Agreement, or the expiration of cancellation of the insurance, CRNAs shall purchase, or arrange for the purchase of, either (I) an extended reporting endorsement ("Tail Coverage") for the maximum period that be purchased from its insurer (ii) "Prior Acts" coverage from the new insurer with a retroactive date on or prior to the date CRNA began performing Services at Hospital or (iii) maintain continuous coverage with the same carrier for the period of the statute of limitations for personal injury.  In the event Management Company is unable to assure that the CRNAs have obtained, or the CRNAs are unable to obtain, the required insurance for or on behalf of any CRNA providing services to the Hospital, Hospital shall require each CRNA to keep and maintain such insurance individually.   All such insurance shall be kept and maintained without cost or expense to Hospital.  In the event the CRNAs have not purchased the required coverage or the Management Company fails to assure that CRNAs have obtained the required coverage, Hospital, in addition to any other rights it may have under the terms of this Agreement or under law, shall be entitled, but not obligated, to purchase coverage. Hospital shall be entitled to immediate reimbursement from Management Company or CRNAs for the cost thereof.  Hospital may enforce its right of reimbursement through set-off against any sums otherwise payable to Management Company.   Management Company or CRNAs shall provide Hospital with a certificate or certificates of insurance certifying the existence of all coverages required hereunder.  Management Company or CRNAs shall request its or their insurance carriers to provide Hospital with not less than thirty (30) days prior written notice in the event of a change in the professional liability policies of CRNAs.

   c.   Management Company, Anesthesiologists, and CRNAs agree to indemnify and hold Hospital harmless from and against any and all liability, losses, damages, claims, causes of action, and expenses, including without limitation, reasonable attorney's fees and costs, resulting from or arising from any act or omission of Management Company, Anesthesiologists, or CRNAs.

   d.   Hospital agrees to indemnify and hold harmless Management Company, Anesthesiologists, and CRNAs from and against any and all liability, losses, damages, claims, causes of action, and expenses, including without limitation, reasonable attorney's fees and costs, resulting from or arising from any act or omission of Hospital.

6.   **REPORTS AND RECORDS.**

   a.   Business Reports and Medical Records.   Management Company    shall cause each of its Anesthesiologists and CRNAs  in accordance with federal and state law, including HIPAA, and in accordance with Medical Staff Bylaws and Hospital Policies, to promptly submit to the Hospital's medical records department the appropriate documentation of the Services rendered under this Agreement.

   b.   Ownership and Access to Records.  Hospital shall own and control all reports and medical records documenting  Services rendered by the Anesthesiologists and CRNAs at Hospital.  Subject to HIPAA, the  Anesthesiologists, CRNAs, or their designated representatives shall have the right of access, review, audit, and copying of medical records relating to their treatment of patients, including for the purposes of compliance audits, which right shall survive the termination of this Agreement; and further provided that Hospital shall be allowed to  review Management Company, Anesthesiologists, and CRNA billing records and reports to the extent that they affect Hospital, or to audit for purposes of this Agreement,  or for the purpose of reviewing for legal compliance for Services provided at Hospital. For four years after services are provided pursuant to this Agreement the Management Company, Anesthesiologists, and CRNAs  agree to allow the Comptroller General of the United States, the U.S.

Anesthesia Services and Management Agreement                                          Page 6

Department of Health and Human Services, and their duly authorized representatives access to this Agreement and to their books, documents and records as are reasonably necessary to verify the nature and extent of the costs of the Services supplied under this Agreement. The Management Company, Anesthesiologists, and CRNAs shall also require any subcontractors providing Services under this Agreement to allow the same access to such subcontractor's records. The Management Company, Anesthesiologists, and CRNAs also agree to make available to Hospital such records as are necessary to allow Hospital to comply with all state or federal health care programs, including substantiation of Hospital costs.

7.  **HOSPITAL OBLIGATIONS.**

   a.  Facilities and Equipment. Hospital shall provide on the Hospital premises the space designated by the Hospital for the Service, plus any expendable supplies, equipment, and services necessary for the proper operation of the Service. Hospital shall maintain all utilities, janitorial, laundry, and other services and equipment as is necessary for the proper operation of the Service.

   b.  Hospital Personnel. Hospital shall employ such non-physician personnel as it deems necessary for the proper functioning of the Anesthesiology Department, for whom the Hospital shall be solely responsible for the hiring, firing, disciplining, compensating, and other personnel management decisions relating to such personnel.

   c.  Nonsolicitation and Noncompetition. Unless otherwise agreed to by Management Company or if Agreement is terminated for any reason, for five (5) years from the Effective date of this Agreement Hospital shall not separately contract with or employ any Anesthesiologist, CRNA, or any legal entity of which they are a member, partner, employee, or a shareholder, previously provided to Hospital or introduced to Hospital by Management Company, except to fulfill the terms of this Agreement; provided that, if Management Company's fault, or a condition in Section 9.g. or 9.h. of this Agreement, causes this Agreement to be terminated, Hospital may hire any anesthesiologist or CRNA who has provided services hereunder; provided further, that if the fault of the anesthesiologist or CRNA causes the termination of this Agreement, Hospital may not hire the anesthesiologist or CRNA, as otherwise provided herein. During this five-year period, Hospital shall not allow any Anesthesiologist or CRNA whom Management Company has provided or introduced to Hospital to perform anesthesia or pain management services at Hospital, except to fulfill the terms of this Agreement. Hospital agrees to a temporary restraining order, preliminary injunction, and permanent injunction, without bond, in the event of a breach of this agreement. Hospital agrees to pay the costs of all attorneys' fees and reasonable costs should a temporary restraining order or injunction be granted to Management Company in connection with a breach hereof.

   d.  Notwithstanding anything to the contrary herein, Dr. Houghton, Dr. Barbieri, and all CRNAs providing services on the effective date of this Agreement may be hired by Hospital in the event of termination of this Agreement.

8.  **PHYSICIAN BILLING AND REIMBURSEMENT**

   a.  Billing. As of the Effective Date Management Company shall be solely responsible for provision of billing, collecting, and retaining professional fees relating to Services provided by the Anesthesiologists. The Management Company shall be solely responsible for billing, collecting, and retaining professional fees relating to Services provided by the CRNAs. All billings shall be in compliance with all applicable payor rules and regulations and all applicable laws.

b. Service Fees. The Anesthesiologists and CRNAs' fees shall be commensurate with those which are usual and customary for similarly situated Anesthesiologists and CRNAs, and Management Company will agree to negotiate in good faith with any managed care provider with whom Hospital has a managed care contract.

c. Access to Patient Information and Data. In accordance with HIPAA, Hospital shall provide the Anesthesiologists and CRNAs with effective access to patient demographic data as to insurance and guarantors and agrees to take all reasonable steps to make this information available in hard copy and/or electronic download and look-up, if available.

d. Independent Contractor Status. Nothing contained herein shall be construed to create an employer/employee relationship, partnership, or joint venture agreement between Hospital and the Management Company, Anesthesiologists and/or the CRNAs. Hospital does retain responsibility for the performance of Anesthesiologists and CRNAs to the extent required by law and the accreditation standard applicable to Facility. Such responsibility, however, is limited to establishing the goals and objectives for the Service and requiring services to be rendered in a competent, efficient and satisfactory manner in accordance with applicable standards and legal requirements. Management Company shall be responsible for determining the manner consistent with the goals and objectives referenced in this Agreement. Hospital shall be responsible for paying its own employees' compensation, and Hospital will not contribute to or pay for tax withholdings, workers compensation, unemployment insurance, social security or any other employment related expenses of the Management Company, Anesthesiologists' or CRNAs. All parties reserve the right to participate in any discussion or negotiations with the Internal Revenue Service regarding this issue, regardless of who initiates such communications or when they occur.

## 9. TERM AND TERMINATION

a. Term. The term of this Agreement shall commence on the Effective Date and continue for a term of five (5) years from the Effective Date ("the Initial Term").

b. Termination by Hospital For Cause. The Agreement may be immediately terminated for cause by Hospital upon providing written notice via hand delivery or certified mail to Management Company, for breaches which are not cured within thirty (30) days of receipt of written notice in the event any of the following occurs: (i) Management Company breaches a material term of this Agreement, which term and the nature of the breach must be identified by Hospital in its notice to Management Company, including the failure of any anesthesia provider to meet the material qualifications or perform the material anesthesia services provided in this Agreement; (ii) the Anesthesiologists and CRNAs provide anesthesia services through a person not qualified as stated herein; (iii) Hospital determines in good faith that the safety of its patients will be jeopardized by the continued use of the Anesthesiologists' or CRNAs' services; (iv) Management Company becomes the subject of voluntary or involuntary bankruptcy proceeding or assignment of assets for the benefit of creditors; (v) the violation of federal or state laws, or (vi) Management Company (a) being or becoming excluded, debarred, or otherwise ineligible to participate in the Federal health care programs as defined in 42 U.S.C. Section 1320a-7b(f) (the "Federal health care programs"), (b) being convicted of a criminal offense related to the provision of health care items or services but has not yet having been excluded, debarred, or otherwise declared ineligible to participate in the Federal health care programs, and c) being aware of any circumstances which may result in Management Company being excluded from participation in the Federal health care programs. Management Company shall immediately notify Hospital of any change in the status of the representation and warranty set forth in this section. Any breach of this section shall give Hospital the right to terminate this Agreement immediately for cause. A material breach by Management Company shall include its failure to perform, after notice to cure, its obligations to provide clinical services as required herein. In the event that Management Company contests the termination for cause,

the Hospital agrees to submit the issue to binding arbitration, during which time, the Anesthesiologists secured by Management Company will continue as the exclusive anesthesia provider for the Hospital, unless the Hospital has concerns about quality of care, patient safety, or disruptive conduct not of a de minimus nature, then Hospital has the right to utilize other providers, until such time when the parties have final resolution from the arbitration proceedings.

c.   Termination by Management Company for Cause. The Agreement may be immediately terminated for cause by Management Company upon providing written notice via hand delivery or certified mail to Hospital, which is not cured within thirty (30) days of receipt by Hospital in the event any of the following occurs: (i) Hospital breaches a material term of this Agreement, which term and the nature of the breach must be identified by Management Company in its notice to Hospital; (ii) dissolution of Hospital; (iii) Hospital becomes the subject of voluntary or involuntary bankruptcy proceeding or assignment of assets for the benefit of creditors; and (iv) failure of Hospital to pay according to the terms of this Agreement. Termination for cause shall not preclude Management Company from seeking any and all remedies available by law or by contract. In the event that Hospital contests the termination for cause, Management Company agrees to submit the issue to binding arbitration, during which time, the anesthesiologists secured by Management Company will continue as the exclusive anesthesia provider for the Hospital unless the Hospital has concerns about quality of care, patient safety, or disruptive conduct not of a de minimus nature, then Hospital has the right to utilize other providers, until such time when the parties have final resolution from the arbitration proceedings.

d.   Alternate Dispute Resolution. The parties firmly desire to resolve all disputes arising hereunder without resort to litigation in order to protect their respective business reputations and the confidential nature of certain aspects of their relationship. Accordingly, any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Health Lawyers Association ("AHLA") or its successor in accordance with its rules, and judgment on the award rendered by the arbitrator or arbitrators shall be binding and conclusive on the parties, and shall be confidential by the parties to the greatest extent possible. No disclosure of the award shall be made by the parties except as required by the law or as necessary or appropriate to effectuate the terms thereof.

e.   Termination Without Cause. No party may terminate this Agreement without cause, unless otherwise agreed by the parties in writing.

f.   Termination at the End of the Term of the Agreement. Either party may terminate this Agreement at the end of the term of the Agreement, or renegotiate a new agreement.

g.   Involuntary Termination Due to Legal or Administrative Changes. In the event that any law, regulation, court decision, or opinion from a federal agency is promulgated which, in the opinion of legal counsel for either party, renders this Agreement, or any part of it, illegal, the parties shall negotiate in good faith for thirty (30) days from the date of notice from either party, to restructure the Agreement and cure the illegality. If the parties are unsuccessful in their negotiations, this Agreement shall be terminated upon notice by either party.

h.   Change Resulting in Termination. In the event (i) Medicare, any third party payor or any federal, state of local legislative or regulatory authority adopts any law, rule, regulation, policy, procedure, or interpretation thereof which establishes a material change in the method or amount of reimbursement or payment for services under this Agreement, or if (ii) any or all such payors/authorities impose requirements which require a material change in the manner of either party's operations under this Agreement and/or the costs related thereto, then, upon the request of either party materially affected by any such change in circumstances, the parties shall enter into good faith negotiations for the purpose of establishing such amendments or modifications as may be appropriate in order to accommodate the new requirements and change of circumstances while preserving the original intent of this Agreement to the

greatest extent possible. If, after thirty (30) days of such negotiations, the parties are unable to reach an agreement as to how or whether this Agreement shall continue, then either party may terminate this Agreement upon thirty (30) days' prior written notice.

i. **Effect of Termination.** Upon termination of this Agreement, all obligations of all parties shall cease, except as to those obligations expressly stated to survive the termination of the Agreement.

10. **MISCELLANEOUS**

a. **Compliance Plan.** Management Company, Anesthesiologists, and CRNAs will develop and adopt a corporate compliance program designed to implement policies and procedures to ensure that their conduct is in accordance with all applicable federal and state laws, rules, and regulations, and to operate within the parameters of any Corporate Integrity Agreement between Hospital and the Office of the Inspector General. The Anesthesiologists and CRNAs shall sign and agree to abide by the compliance plan as a condition of their continued employment. The compliance plan shall provide for annual audits to identify whether prior deficiencies have been corrected and to check for new issues.

b. **Notices.** Any notice, demand, or communication made under this Agreement, unless otherwise specified hereunder, shall be deemed given when delivered via certified mail to the parties listed below:

> **To Hospital:**
> Grand Strand Regional Medical Center
> 809 82nd Parkway
> Myrtle Beach, SC 29572
> Attn: Dong White, CEO
>
> **To Management Company:**
> Stephen V. Hill
> Anesthesia Management Solutions, L.L.C.
> P.O. Box 6475
> Highpoint, NC 27262

c. **Governing Law and Venue.** This Agreement shall be governed by the laws of South Carolina. Venue shall be Horry County, SC .

d. **Assignment.** Neither the Management Company or the Hospital can assign this Agreement without the prior written consent of the other party, which shall not be unreasonably withheld. Management Company agrees that its contract with the current Anesthesiologist Group and the current CRNA Group will prohibit any assignment of the Services they are contractually obligated to provide under this Agreement without the prior written consent of Hospital.

e. **Waiver of Breach.** The waiver by either party of a breach or violation of this Agreement shall not operate or be construed as a waiver of any subsequent breach of the same or other provision of the Agreement.

f. **Severability.** In the event that any provision of this Agreement is declared to be invalid or unenforceable for any reason, said provision shall be severable from the remainder of the Agreement which shall continue in full force and effect.

g. **Confidentiality.** Except as otherwise provided herein or as required by law, neither party shall disclose any information which is confidential or proprietary of the other, and each party shall abide by the patient confidentiality provisions of HIPAA or other applicable state or federal law.

h.   <u>Entire Agreement.</u> This Agreement shall constitute the entire agreement between the parties and supersedes any and all previous contracts, negotiations or agreements, oral or written, between the parties. Any amendment to this Agreement shall be in writing and signed by the parties.

i.   <u>Non-Discrimination.</u> In providing services under this Agreement, neither party shall discriminate on the basis of race, color, sex, age, religion, national origin, or disability.

j.   <u>Attorneys' Fees and Costs.</u> In the event that either party institutes litigation to enforce the terms of this Agreement, the prevailing party as determined by the court shall be paid its reasonable attorneys= fees and costs by the other party.

k.   <u>Counterparts.</u> This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date listed below.

## SIGNATURE PAGE

Effective Date of Agreement: this ___24___ day of ___September___, 2001.

_____
Grand Strand Regional Medical Center
By: Doug White, C.E.O.

_____
Anesthesia Management Solutions, L.L.C.
By: James W. Cottrell, M.D., Managing Member

## EXHIBIT 1

### Income Guarantee for CRNAs

1.  Hospital agrees to reimburse Management Company certain amounts of money which Hospital shall disburse as a guarantee of Gross Cash Receipts (as defined below) for each CRNA of Seven Thousand Seven Hundred Forty Three Dollars and Twenty Three Cents ($7,743.23) (hereinafter the "Guarantee Amount") per two (2) week period (hereinafter the "Guarantee Period") for Thirteen (13) pay periods beginning on the first date work is performed in the Hospital under this Agreement. The payments shall be made in accordance with this Addendum. Gross Cash Receipts and any Guarantee Amount payments are to be used to cover the expenses of the CRNAs clinical practice at the Hospital's facilities.

2.  The Guarantee Amount is applied to the CRNA full time equivalents. The initial number of CRNAs is nine (9).

3.  On the last day of the Guarantee Period, Management Company shall forward a statement of Gross Cash Receipts for each CRNA for the preceding Guarantee Period to Hospital. As used herein, the term "Gross Cash Receipts" shall mean all cash collected by CRNA, minus any refunds or repayment to patients or third party payors, from all phases of his/her medical practice from any and all sources whatsoever, including, but not limited to, office calls, hospital practice and emergency room treatments.

4.  At the end of each Guarantee Period, Hospital shall pay to Management Company the amount by which each CRNA's Gross Cash Receipts are less than the Guarantee Amount. The amount paid shall be the "Guarantee Payment." Guarantee Payments to Management Company shall be made within three (3) business days following receipt of Management Company's statement of Gross Cash Receipts. If, however, during any month during the term of this Agreement, CRNA's Gross Cash Receipts are equal to or exceed the Guarantee Amount, the Hospital shall have no obligation hereunder to pay Management Company any amount for such Guarantee Period.

5.  Upon completion of the Thirteen (13) Guarantee Periods, the Guarantee Period will be every calendar month for the remainder of the term of the Agreement. Simultaneously, the Guarantee Amount will be Sixteen Thousand, Seven Hundred Seventy Seven Dollars ($16,777). The compensation paid to the Management Company for CRNAs will not exceed Sixteen Thousand, Seven Hundred Seventy Seven Dollars ($16,777) per month per CRNA nor One Million, Eight Hundred Thousand for per year of the Agreement; provided that, Hospital shall not pay Management Company an amount greater than actual expenses hereunder.

6.  Hospital shall have the right to review and audit CRNA's books and records for whatever period of time is necessary to assure compliance with this Agreement.

_____  10/11/01          _____
Grand Strand Regional Medical Center,                 Anesthesia Management Solutions, L.L.C.
L.L.C. d/b/a Grand Strand Regional Medical Center     By:  James W. Cottrell, M.D., Managing Member
By:  Doug White, C.E.O.

-12-

## EXHIBIT 2

### Medical Director of Anesthesiology

The Medical Director of Anesthesiology shall assist Hospital in performing the following medical administrative services as reasonably requested by Hospital in connection with operation of the Anesthesia Department:

1. **Selection.** The Medical Director of the Anesthesiology Department shall be chosen by the CEO from the Anesthesiologists secured by Management Company.

2. **Tenure.** The Medical Director shall serve in that capacity for the term of this Agreement. Hospital reserves the right to choose another Anesthesiologist to serve as Medical Director with Sixty (60) days notice to the Management Company.

3. **Duties.** In addition to such duties and responsibilities as may be prescribed by the Hospital and its Medical Staff bylaws, the Medical Director's duties shall include the following: participate as requested in the administration functions as necessary to ensure the effective and efficient management of the Service; provide such supervision, management and oversight to the Service to assure that the professional services rendered meet or exceed accepted standards of care; cooperate with Hospital regarding administrative, operational or personnel problems in the Service and promptly inform Hospital and appropriate Medical Staff committees of professional problems in the Service in accordance with Medical Staff Bylaws, Rules and Regulations and Hospital policy; assure maintenance of accurate, complete and timely patient and other records regarding the Service in order to facilitate the delivery of quality patient care and provide the information required for Hospital to obtain payment for its services; input into the administration of the Hospital's Department of Anesthesiology, including but not limited to establishment of departmental policies and procedures; supervision and training of personnel and staff in the proper manner, techniques and means of providing  Services in accordance with the standard of practice in the community; participation in the Hospital's budget and long range planning process with respect to the delivery of Services; overseeing of the management and planning of adequate facilities, equipment, and supplies to ensure proper delivery of  Services; and ensuring that the Department is at all times maintained and operated in a professional manner consistent with quality assurance standards of the Hospital's Medical Staff By-Laws and in compliance with all applicable statutes, rules, and regulations of federal and state governing bodies having jurisdiction over the Hospital, applicable standards of the Joint Commission on Accreditation of Healthcare Organizations; schedule anesthesiologists and CRNAs to the extent and in such a manner as may be reasonably requested by the Hospital; assist the Hospital with its recruitment and hiring of physicians, other professional personnel, and support staff to work in the department or other areas of the Hospital; assist the Hospital in the development of job standards and policies with respect to the Anesthesiologists and CRNAs in the department; conduct periodic evaluations of the adequacy and appropriateness of medical services provided in the department and the physicians, other professionals, and support staff providing such services; assist the Chief Executive Officer or his/her designee in establishing a budget for the department; develop and administer an Anesthesia Staff Development Plan; develop an approach (method and frequency) used to assess the effectiveness of the quality management program for both clinical activity and operations; attend meetings within reason, including committee meetings, as scheduled by the Hospital and the Executive Committee of the Medical Staff.  In addition,  meet when necessary with the Chief Executive Officer of the Hospital or his/her designee or the Chief of the Medical Staff to review the Department's performance and level of services; participate in the development, implementations, and monitoring of the Hospital's overall quality assurance program, including quality improvement process and utilization review.  As part of the Hospital's overall quality assurance program, the Director shall establish procedures to assure the consistency and quality of all services provided by the Anesthesiologists and CRNA; provide technical and professional advice concerning continuing medical education opportunities for staff and personnel regarding the delivery of Anesthesia Services, and participation on a reasonable basis in continuing medical education programs; make recommendations to the Hospital concerning the qualifications, employment, termination and discipline of physician and non-physician personnel; support and encourage those medical practices, which lead to the efficient and effective delivery of medical care, particularly in the specialty of anesthesiology; perform such other related services for the

Hospital as may be reasonably requested by the President and Chief Executive Officer of the Hospital or his designee; maintain appropriate documentation of his or her administrative services.

4.  Payment and Terms of Payment.  Management Company shall pay the Medical Director the sum of $125 per hour for up to 8 hours per month, not to exceed $1,000 per month, or $12,000 for the year, for the duties set forth herein.  The Medical Director's time shall be substantiated by appropriate documentation, such as time sheets showing the date, time spent, and duties performed at the end of every month.  Hospital shall reimburse Management Company on the 10th day of the next months for hours actually worked and appropriately documented.

_____ 10/11/01
Grand Strand Regional Medical Center,
L.L.C. d/b/a Grand Strand Regional Medical Center
By:  Doug White, C.E.O.

_____
Anesthesia Management Solutions, L.L.C.
By:  James W. Cottrell, M.D., Managing Member

## EXHIBIT 3

## INCOME GUARANTEE FOR ANESTHESIOLOGISTS

Background.  In order to provide quality care to Hospital's patients there is a significant and essential need for twenty-four (24) hour coverage and the provision of Services.  Management Company is willing and able, through the licensed anesthesiologists whom it supplies to Hospital, to provide such twenty-four (24) hour coverage and the provision of Services to Hospital.

The anesthesiology coverage and services required by the Hospital in order to provide quality patient care requires the availability of an adequate number of Anesthesiologists to allow for the operation of sufficient operating rooms, and to provide twenty-four (24) hour coverage of Hospital's labor and delivery unit.  However, the current case load and payor mix may not support the number of anesthesiologists required to provide such quality patient care. Hospital is willing to provide to Management Company an income guarantee as outlined below to assure the availability of an adequate number of Anesthesiologists.

1.   In exchange for Management Company  supplying  a sufficient number of Anesthesiologists to provide 24-hour anesthesia coverage at Hospital as described above, Hospital agrees to loan Management Company, certain amounts of money which Hospital shall advance as a guarantee of Gross Cash Receipts (as defined below) for each Anesthesiologist of Seventeen Thousand Nine Hundred Forty Eight Dollars and Seventy Two Cents ($17,748.72) (hereinafter the "Guarantee Amount") per two (2) week period (hereinafter the "Guarantee Period") for Thirteen (13) pay periods beginning on the first date work is performed in the Hospital under this Agreement. The payments shall be made in accordance with this Addendum. Gross Cash Receipts and any Guarantee Amount payments are to be used to cover the expenses of the Anesthesiologists clinical practice at the Hospital's facilities.

2.   The Guarantee Amount is applied to the Anesthesiologists full time equivalents.   The initial number of Anesthesiologists is four and a half (4.5).

3.   On the last day of the Guarantee Period, Management Company shall forward a statement of Gross Cash Receipts for each Anesthesiologist for the preceding Guarantee Period to Hospital.  As used herein, the term "Gross Cash Receipts" shall mean all cash collected by Anesthesiologists, minus any refunds or repayment to patients or third party payors, from all phases of his/her medical practice from any and all sources whatsoever, including, but not limited to, office calls, hospital practice and emergency room treatments.

4.   At the end of each Guarantee Period, Hospital shall pay to Management Company the amount by which each Anesthesiologists' Gross Cash Receipts are less than the Guarantee Amount. The amount paid shall be the "Guarantee Payment." Guarantee payments to Management Company shall be made within three  (3) business days following receipt of Management Company's statement of Gross Cash Receipts.  If, however, during any month during the term of this Agreement, Anesthesiologist's Gross Cash Receipts are equal or exceed the Guarantee Amount, the Hospital shall have no obligation hereunder to pay Management Company any amount for such Guarantee Period.

5.   Upon completion of the Thirteen (13) Guarantee Periods, the Guarantee Period will be every calendar month for the remainder of the term of the Agreement. Simultaneously, the Guarantee Amount will be One Hundred Seventy Five Thousand Dollars ($175,000) per month for all Anesthesiologists and no Locum Tenens Coverage will be paid. The compensation paid to the Management Company for Anesthesiologists will not exceed  One Hundred Seventy Five Thousand Dollars ($175,000) per month nor Two Million, One Hundred Thousand ($2,100,000) for per year of the Agreement.

6.   Hospital shall have the right to review and audit physician's books and records for whatever period of time is necessary to assure compliance with this Agreement.

7.  Hospital will compensate Management Company for the Incremental Cost of Locum Tenens Anesthesiologists necessary to staff the Anesthesia Department until permanent physicians are employed, not to exceed 4.5 FTE Locum Tenens Anesthesiologists during the first six months of the Agreement.  "Incremental Costs" will mean for each day that a Locum Tenens Anesthesiologist is paid for weekday coverage, Hospital shall pay the fees for the Locum Tenens Anesthesiologists, in excess of $1,000 per day for an 8-hour day and in excess of $2,000 per Locum Tenens Anesthesiologists per day of 24-hour call.  This income will go against the income guarantee.

8.  Management Company shall cause Coastal Anesthesia Medical Group ("CAMG") to repay the amount of Guarantee Payments paid to Management Company during the first twelve (12) months of the contract according to the terms of a repayment schedule of Thirty-six equal monthly installments and one final installment for the balance due, payable on the fifth (5th) day of each month, payable with interest at two percent (2%) over prime rate with interest to begin accruing on September___, 2002.  All subsequent Guarantee Payments paid to Management Company shall be repaid by CAMG in accordance with Paragraph 9 below.  This section will survive the termination of this Agreement.

9.  The repayment obligations represented in the repayment schedule shall be a perfected security interest in the accounts receivable of CAMG and pursuant to a Security Agreement and a Promissory Note with Hospital. Management Company warrants that CAMG will sign a promissory note in the form attached hereto as Exhibit 4, and further warrants that CAMG will sign an assignment of accounts receivable in the form attached hereto as Exhibit 5.  The promissory note shall be for the purpose of repaying funds provided by Hospital to Management Company for CAMG Services provided under this Agreement.  The purpose of the assignment of accounts receivable shall be to secure the promissory note.  Management Company will provide Hospital CAMG's original signed promissory note and assignment of accounts receivable within 15 days from the signing of this agreement. The Hospital will allow 120 days grace period for collection of above pledged accounts receivable prior to calling of the above repayment obligations.  This Section will survive the termination of the Agreement.

10.  Management Company and Anesthesiologists shall cooperate fully with Hospital's efforts to obtain repayment and agree to compensate Hospital for any attorney's fees in enforcing this provision.

11.  Management Company agrees to arrange for the billing of all patients and third-party payors promptly for all services rendered and to provide billing personnel who use their best efforts to collect all patient accounts. Management Company further agrees patients and third-party payors shall be billed as soon as reasonably practical following services to the patient.  Hospital shall have the right to review and audit Management Company's and Anesthesiologists' books and records for whatever period of time is necessary to assure compliance with this Agreement.

12.  Following termination of this Agreement, Management Company agrees to collect all remaining collectible accounts receivable for dates of service on or before the termination date.  If Hospital still has an outstanding balance owed, Management Company shall remit all collections, minus collection expenses, including contracted billing company expenses, to Hospital until the outstanding balances is paid or until Six (6) months have passed, whichever occurs first.  Hospital maintains the right to review and audit Management Company's books and records to determine collectability of any remaining accounts receivable.  This Section will survive the termination of this Agreement.

13.  Nothing in this Addendum shall be construed to require the Anesthesiologists to utilize Hospital to provide inpatient, outpatient, or any other services to patients or otherwise generate business for Hospital.  Further, neither party, nor the Anesthesiologists provided by Management Company, shall conduct themselves in such a manner as to violate the prohibition against fraud and abuse in connection with Medicare and Medicaid programs, including, but not limited to 42 U.S.C. § 1320a-7b.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

_____  10/11/01

**Grand Strand Regional Medical Center,**
**L.L.C. d/b/a Grand Strand Regional Medical Center**
**By:  Doug White, C.E.O.**

_____

**Anesthesia Management Solutions, L.L.C.**
**By:  James W. Cottrell, M.D., Managing Member**

Exh. B

PBS

NOV 28 '01 16:50  TO=14138264455        FROM=VAN HOY, REUTLINGER & ADAMS        T-890  P.04/27  F-618   FINAL
                                                                                                        12/4/01

<u>**THIS AGREEMENT CONTAINS A BINDING, IRREVOCABLE
AGREEMENT TO ARBITRATE AND IS SUBJECT TO ARBITRATION
PURSUANT TO TITLE 15, CHAPTER 48 (UNIFORM ARBITRATION ACT) OF THE
CODE OF LAWS OF SOUTH CAROLINA**</u>

## MANAGEMENT SERVICES AGREEMENT

This **MANAGEMENT SERVICES AGREEMENT** ("Agreement") is made and entered into effective this 28th day of September 2001 ("Commencement Date") by and between **ANESTHESIA MANAGEMENT SOLUTIONS, L.L.C.**, a North Carolina limited liability company (hereinafter "AMSol" or "Company") **COASTAL ANESTHESIA MEDICAL GROUP, L.L.C.**, a South Carolina limited liability company (hereinafter "Client");

**WHEREAS**, AMSol is in the business of providing healthcare providers with management services;

**WHEREAS**, Client provides medical services to patients in hospitals, ambulatory surgery centers, physician offices, and other appropriate care management locations;

**WHEREAS**, Client desires to enter into this Agreement with AMSol under which AMSol shall provide exclusive management services for the exclusive professional medical services provided by the Client at Grand Strand Regional Medical Center ("GSRMC");

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. **Term and Termination.** This Agreement shall have an Initial Term of five (5) years, beginning on the Commencement Date. Thereafter, this Agreement shall automatically renew indefinitely for successive five-year terms unless terminated as provided hereinafter.

   a. Neither party may terminate this Agreement without cause; provided that, termination without cause may be effectuated at the end of the term of the Agreement by giving at least ninety (90) days written notice of termination prior to the completion of the Initial Term or any renewals.

   b. Either Client or AMSol may terminate this Agreement for cause, with cause being defined for purposes of this Agreement as the breach of any material term of this Agreement, including but not limited to (i) Client or Client's providers modification or revocation of payment disposition instructions as defined herein, (ii) failure of AMSol to process patient accounts and submit and follow up on claims on a timely basis, (iii) Client's non-payment or late payment of any AMSol invoice, (iv) dissolution or loss of service privileges by Client, or (v) insolvency of AMSol or Client. Termination for cause

NOV 28 '01 16:50  TO=14138264455          FROM-VAN HOY, REUTLINGER & ADAMS          T-890  P.05/27  F-618

pursuant to subsection b.(i) and b.(iii) herein shall be upon ten (10) days notice. All other causes of termination shall be upon thirty (30) days written notice. All notices of termination shall be made to the other party, detailing the reasons which describe the material breach of this Agreement. Such termination shall take effect at the end of the aforementioned period unless the breaching party has cured the breach. Any outstanding invoices of AMSol as of the date of termination will be due and payable within seven (7) days. No waiver by either party of its right to terminate for cause shall be construed as a waiver of its right to terminate for cause with respect to any subsequent breach.

c.  The failure of Client to turn over any monies owed to AMSol under this contract shall be considered theft and conversion of funds.

d.  If this Agreement is terminated within the first twelve (12) months, Client shall owe and immediately pay AMSol two months of management fees. If this Agreement is terminated after the first twelve (12) months, Client shall owe and immediately pay AMSol one month of management fees. Each month of management fees shall be equal to an average of the fees paid to AMSol during the previous twelve (12) months, or if the contract has been in existence for less than twelve (12) months, the average of the fees paid to AMSol during the months in which the contract has been in existence.

e.  Should Client terminate the Agreement, AMSol shall be entitled to receive payment for its services through the last date it renders management services hereunder, even if those services survive the term of the Agreement.

f.  Upon termination of the Agreement, AMSol may, at its sole election, continue to collect the outstanding accounts receivable for 90 days from the date of termination. Client gives AMSol the right to deduct the management fees described to in Section 3 below from receipts collected on behalf of Client.

g.  Upon termination of the Agreement, AMSol may, at its sole election, immediately and without notice, terminate Client as the anesthesia and pain management providers at any hospital at with AMSol has a contract to provide anesthesia services; provided, that this clause shall not apply to Drs. Barbieri and Houghton; and further shall not apply to the extent that Client anesthesiologists may continue to provide medical services at GSRMC under Section 7 of the Anesthesia Management and Services Agreement between AMSol and GSRMC dated September 24, 2001 ("AMSA").

2.  <u>Duties of Company.</u>

a.  Company will render and perform or cause to be rendered or performed, on a timely basis, the services hereinafter described, relating to management of services for Client, any of which may be outsourced by Company to third party individuals or companies, as Company in its sole discretion shall decide:

b.  Perform comprehensive patient account management services related to the patient care services rendered by Client, including but not limited to processing of claims and bills, collections of billed accounts, charge offs, and sending accounts to collection agencies; provided that Company shall comply with all applicable state and federal laws in this

2

NOV 28 '01 16:51   TO=14138284455        FROM-VAN HOY, REUTLINGER & ADAMS        T-690  P.06/27  F-618

regard :

c.    Establish appropriate banking relationships to facilitate timely deposit of receipts and appropriate transfer or disposition to Company designated accounts;

d.    Preparation and administration of client payables including payroll, as directed by Client;

e.    Preparation and production of client monthly financial statements;

f.    Preparation and implementation of insurance acquisition and enrollment, including malpractice insurance, general liability insurance, health insurance, disability and life insurance, as requested by Client;

g.    Preparation of Client corporate tax returns;

h.    Preparation of documents for and administration of all hospital and payor licensing and credentialing;

i.    Negotiation and management of all facility contracts and all payor contracts;

j.    Negotiation and management of all specialized contracts with other physicians, such as fees for anesthesia services for plastic surgery;

k.    Development and administration of all corporate legal documents, bylaws, shareholder agreements and employee contracts, as directed by Client; provided however, that this obligation shall exclude management of or payment for litigation;

l.    Recruitment of employee physicians and CRNAs (in this Agreement the term "CRNAs" shall include "AAs"), whose employment will be subject to approval of Client; provided however, that this obligation shall exclude payment of locum tenens physician fees, per diem fees for CRNAs, relocation fees of any provider, payment of recruitment fees, and payment for travel costs;

m.    Preparation and implementation of a corporate compliance plan; and

n.    Administration of self-directed retirement or pension plans; provided that, Client shall fund the premiums and payments related to such plans.

3.    Payment for Services.  Client shall pay a management fee to AMSol in accordance with the following schedule:

a.    Client shall pay AMSol 15% of Receipts, calculated and payable biweekly, during the first year of the Agreement and 12% during the remaining years of the Agreement.

b.    If new facilities are added during the term of this Agreement in addition to those facilities at which Client provides anesthesia or pain management services at the beginning of this Agreement, payment of AMSol's fees attributable to those new facilities shall be 15% of the Receipts from, or attributable to, the new facilities for the first year of management of

3

the new facilities and 12% for subsequent years.

c.  "Receipts" are defined as including monies paid to Client from all sources, including but not limited to collections from billed services, subsidies, stipends, or grants from hospitals or other parties, less refunds and other contractual adjustments, and specifically excludes any guaranteed payments received by AMSol from GSRMC.

d.  Regarding payment disposition instructions, all Client's Receipts shall be deposited into a bank of AMSol's choice, over which Client shall have sole signature control. Client shall execute a written, revocable Power of Attorney to AMSol in a form acceptable to AMSol's bank, allowing AMSol to issue instructions to the bank, to notify AMSol of all deposits and to sweep deposits daily from Client's account into an account designated by AMSol. The revocable Power of Attorney shall be revocable at any time upon delivery of notice of termination of the Power of Attorney to both the Bank and to AMSol. Once the Receipts have been transferred into an account over which AMSol has signatory authority, AMSol shall make all necessary payments in a prompt manner both to Client, to third parties, and to itself as is legally or contractually, appropriate. AMSol shall pay itself for its services under this Agreement immediately upon submitting an invoice for biweekly and management fees due as provided above.

4.  **Confidentiality and Proprietary Information.**  Confidential and proprietary information shall be defined as non-public information concerning the other Party's business, including that of affiliates or subsidiaries, and each Party shall not permit the duplication or disclosure of any confidential and proprietary information including but not limited to the Fee in Paragraph 3 above to any person (other than employee or disclosed agent of the other Party who must have such information for the performance of its obligations hereunder), unless such duplication, use or disclosure is specifically authorized by the other Party in writing, or is required by law.

5.  **Material Changes.**  In the event that during the term of this Agreement, including any extensions or renewals hereof, any applicable law or regulation shall be enacted, or any decree or order of any court or administrative agency shall be entered, Client shall enter into or become bound by any contractual arrangement, or other circumstances shall occur which result in a material change in the cost of providing services described herein, including a change in the CPT guidelines, either party may request renegotiation of the applicable terms of this Agreement by written notice to the other party. If no new Agreement is reached within sixty (60) days of receipt of such notice, either party may terminate this Agreement upon an additional sixty (60) days written notice.

6.  **Duties of Client**

   a.  Client shall have the duty to comply with all requests made of Client by AMSol which are reasonably necessary for AMSol to carry out its obligations under this Agreement.

7.  **Corporate Records, Confidentiality, Release of Information**

   a.  AMSol agrees that until the expiration of four (4) years after the furnishing of services provided under this Agreement, AMSol shall make available, upon written request, to the

4

Secretary of the U.S. Department of Health and Human Services, or upon request, to the Comptroller General, or any of their duly authorized representatives, this Agreement and books, documents, and records in the possession of AMSol necessary to certify the nature and extent of costs incurred with respect to any services furnished for which payments may be made under the Medicare and Medicaid programs. All information and data relating to Client submitted by Client to AMSol under this Agreement shall be treated as confidential by AMSol, in compliance with all privacy laws and regulations, and shall not, unless otherwise required by law, be disclosed to any third party by AMSol without Client's written consent; however, AMSol shall have the right to compile and distribute statistical analyses and reports utilizing aggregated data derived from information and data obtained from Client, other AMSol Clients, and other sources.

8.    **Proprietary Information**.

a.    Unless otherwise agreed by the parties, all programs, documentation, specification, tapes, instruction manuals and similar material developed or used by AMSol in connection with this Agreement are and shall remain the sole and exclusive property of AMSol. Client shall retain in strict confidence all knowledge of AMSol's programs, documentation, techniques, and assistance and shall use due care to preserve any and all such materials in its possession and prevent the disclosure of the contents thereof to any third party. AMSol shall retain in strict confidence all knowledge of Client's contracts, fee schedules, documentation, and shall use due care to preserve any and all such materials in its possession and prevent the disclosure of the contents thereof to any third party. Upon termination of this Agreement and full payment of all outstanding invoices AMSol agrees to return any and all Client proprietary material to Client. This material will include but not be limited to: payor contracts, fee schedules, credentialing data, and patient account information.

9.    **Limitation of Liability and Indemnification**.

a.    Liability under this Agreement for a breach of any of the terms hereunder by a party shall be strictly limited to the actual damages suffered by the other and such party shall not be liable for special, indirect, consequential, or incidental damages, including loss of profits. Further, to the extent of, but not in addition to, its applicable liability insurance limits, each party hereby agrees to indemnify and save harmless the other party from any and all judgments, claims and expenses, including attorneys' fees, arising from or related to any act or omission of the party which is covered under that party's insurance policy. Each party shall maintain in force and effect a general liability policy in an amount not less than $500,000 per occurrence. The indemnification and hold harmless provision stated herein shall survive the termination of this Agreement. In consideration for AMSol implementing and maintaining a corporate compliance plan for Client, including one external audit per year, AMSol shall not be responsible for any claims of fraud or abuse levied against Client or any of its providers, including any criminal or civil penalties which arise from Client's failure to comply with any federal or state statues, rules or regulations. Conversely, Client shall not be responsible for any claims of fraud or abuse levied against AMSol, including any criminal or civil penalties which arise from AMSol's failure to comply with any federal or state statues, rules or regulations. AMSol

agrees to notify Client of any identified areas of potential noncompliance with respect to improper billing or coding Client's claims, and Client agrees to immediately rectify all noncompliance, once notified.

10.   **Assumption of Terms of Hospital Contract and Noncompete.**

    a.   Notwithstanding anything to the contrary stated herein, Client agrees to be bound by those provisions of the Anesthesia Management and Services Agreement ("AMSA") executed between AMSol and Grand Strand Regional Medical Center ("GSRMC") GSRMC which relate to anesthesiologists. The AMSA contains provisions requiring AMSol to ensure that the anesthesiologists provide services, undertake specified obligations, not engage in certain conduct, adhere to required conditions, etc. Client hereby assumes and agrees to be bound by all provisions in the AMSA which relate to anesthesiologists to the same extent as if Client had separately contracted with GSRMC in regard to the provisions relating to anesthesiologists in the AMSA, which provisions are incorporated herein by reference. A copy of the AMSA is attached as an Exhibit to this Agreement. Client agrees to sign the Promissory Note furnished by GSRMC to repay the Income Guarantee provided by GSRMC to AMSol and to sign the Assignment of Accounts Receivable in favor of GSRMC, assigning Client's accounts receivable to secure the aforesaid Promissory Note.

    b.   **Exclusion of Providers.** Pursuant to the AMSA, GSRMC has the right to demand that AMSol prohibit any anesthesia providers, including anesthesiologists, from performing services at GSRMC. Client agrees that if GSRMC makes any demand pursuant to the AMSA in relation to the anesthesiologists, that Client will comply with those demands, including but not limited to precluding the specified anesthesiologist from providing anesthesia services at GSRMC.

    c.   **Noncompete with AMSol.** Client acknowledges that AMSol has a financial interest in maintaining the AMSA with GSRMC. Client agrees that Client will not solicit or provide anesthesia services to GSRMC, or any other hospital at which AMSol negotiates a contract for Client to provide anesthesia or pain management services, without AMSol's written consent, during the term of said agreement and for a period of two years after the termination of said agreement; provided however that, Client anesthesiologists may continue to provide medical services at GSRMC as provided in Section 7 of the AMSA in the event the AMSA is terminated.

11.   **Waiver.**   Any failure or forbearance by a party to pursue immediately any of its rights and remedies under this Agreement shall not operate as a release or waiver of its right to enforce the terms and conditions of this Agreement in the future.

12.   **Change in Control and Liquidation.**   In the event of liquidation, bankruptcy, assignment for the benefit of creditors or receivership of either party to this Agreement, this Agreement may be immediately terminable by either party. The party in bankruptcy, receivership, assignment or liquidation shall notify the other party of such change or liquidation as soon as is practicable after such event.

13.  **Assignment.**  This Agreement may be assigned by Client with the written permission of AMSol; AMSol may assign this Agreement as it, in its sole discretion, determines.

14.  **Choice of Law.**  This Agreement shall be governed in all respects by the laws of the State of South Carolina.

15.  **Survival Representations.**  The terms, provisions, representations and warranties contained in this Agreement shall survive the delivery of all deliverables, goods or services hereunder.

16.  **Amendments in Writing.**  No alteration, modification, waiver, provision or amendment to this Agreement shall be effective unless it is in writing and signed by duly authorized representatives of the parties.

17.  **Scope of Authority and Power of Attorney.**  In its dealing under this Agreement with patients, insurers, third party payors, guarantors and any others having obligations to pay all or a portion of the accounts of patients of Client, AMSol shall act as agent for, in the name of Client, and this Agreement shall be the sole evidence necessary to establish that AMSol has the Power of Attorney to act on behalf of Client in the matters set forth herein.

18.  **Notices.**  All notices, and other communications required or permitted under this Agreement shall be deemed given and received if delivered in person by overnight delivery service, or by first-class United Sates mail, postage prepaid and certified to the last known address of that party.  Any such notice shall be deemed given as of the date placed in the mail or with overnight delivery service.

19.  **Severability.**  The invalidity of any provision of this Agreement shall not affect the validity of any other provision, and this Agreement shall be construed as if invalid provisions had been omitted.  In the event any term or provision of this Agreement is found to be unenforceable or void, in whole or in part, as drafted, then the offending term or provision shall be construed as valid and enforceable to the maximum extent permitted by law, and the balance of this Agreement shall remain in full force and effect.

20.  **Medical Director.**  Client agrees that the Medical Director of the Department of Anesthesia at the facilities where anesthesia services are provided shall be chosen by a consensus of AMSol and the facility administrators, and that Client shall not have the right to elect or remove said Medical Director.

21.  **Binding Arbitration.**  The parties firmly desire to resolve all disputes arising hereunder without resort to litigation in order to protect their respective business reputations and the confidential nature of certain aspects of their relationship.  Accordingly, any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Health Lawyers Association (AHLA) or its successor in accordance with its rules, and judgment on the award rendered by the arbitrator or arbitrators shall be binding and conclusive on the parties, and shall be confidential by the parties to the greatest extent possible.  No disclosure of the award shall be made by the parties except as required by the law or as necessary or appropriate

NOV 28 '01 16:53  TO-14138264455        FROM-VAN HOY, REUTLINGER & ADAMS        T-890  P.12/27  F-618

**IN WITNESS WHEREOF,** the parties hereto have caused their duly authorized representatives to execute this Agreement effective as of the day and year first above written.

Anesthesia Management Solutions, L.L.C.          Coastal Anesthesia Medical Group, L.L.C.

By: _Stephen V. Hill_                            By: _____
    Stephen V. Hill, Managing Member                  Manager

c:AMSol\Grandstrand\Anc.LLC.Management.11.25.01



*Exh C*



February 16, 2007

Joseph A. Maggioncalda, M.D.
Coastal Anesthesia Medical Group, L.L.C.
134 Northgate Road
Myrtle Beach, SC 29572

Re:    Agreements -- Grand Strand Regional Medical Center

Dear Joe:

This letter is written by way of notification that the Anesthesia Services and Management Agreement (the "ASMA") between Grand Strand Regional Medical Center ("GSRMC") and AmSol, as extended by addenda, expires on February 28, 2007. That being the case, the continued effectiveness of the Management Services Agreement ("MSA") between Coastal Anesthesia Medical Group ("CAMG") and AmSol must also be addressed.

A Professional Services Agreement (the "PSA") has been entered into between GSRMC and American Integrated Management ("AIM"), with an effective date of March 1, 2007. As a condition precedent to being awarded that agreement, AIM had to ensure GSRMC that the provider entities by and through which thee clinical services obligations of the PSA were to be fulfilled would be actively managed by AmSol. I know that Dr. Cottrell, along with Brian McMillan, Esq. and Tom Gilroy, discussed the new contracting schemata. I understand you are in full accord with this approach. To that end, CAMG, if it desires to continue providing services at GSRMC, will need to either revise its current operating agreement or adopt a new one, reflecting the group's acceptance of this new approach. Either way, the operating agreement developed will need to be satisfactory to AIM. To assist this process along, I will prepare a suggested draft of a new agreement and get it to you in the next few days.

*THE ONLY MSA OVER FIVE YRS OLD IS THE GSRMC MSA OF 9-29-01*

In addition, there will need to be a new MSA between CAMG and AmSol. Since our prior agreement is over five years old now, it is in need of updating by way of substantial revision to its terms and conditions to be in line with AmSol's other MSAs.

CAMG is also part of the Anesthesia Services Agreement with Strand Anesthesia ("SA") and AmSol. Under that agreement, CAMG engages SA to be the exclusive provider of nurse anesthesia services. The expiration of the ASMA and the effectiveness of the PSA certainly qualify as "changes that would reasonably require a material change in this Agreement;" therefore, we will need to negotiate in good faith "how and whether those changes can be incorporated" in the tripartite agreement.

---

Anesthesia Management Solutions, LLC • PO Box 6633, High Point, North Carolina 27262 • Ph 336.884.1830 • Fax 336.884.1355

www.amsol.biz

Letter to Joseph Maggioncalda, M.D.
February 16, 2007
Page 2

We have already had some preliminary discussions with Richard Smyres and now that the uncertainty of the hospital contract has resolved, we can speak in other than hypothetical terms. Jim Cottrell, Terry Cline and I are traveling to Myrtle Beach for meetings with the owners of SA and with the CRNAs as a whole, as well as separately with CAMG, just as soon as we can coordinate everyone's schedule.

I know that you, as a member of AmSol, L.L.C., understand and appreciate the necessity of this evolution in our contracts for the services in Myrtle Beach. Your assistance in communicating these positive developments to the members of CAMG and gaining their support will most certainly benefit AmSol. I know you will put forth your best efforts to make this a successful transition.

Look for draft agreements early next week. In the meantime, if you have any questions or concerns regarding any matter presented herein, please address the same with me directly at your earliest possible opportunity. I look forward to seeing you soon.

Regards,

Rick Snow


Cc:    James W. Cottrell, M.D.
       Kim Kleiber

wnership

**Exh. D**

**Subject:** Ownership
**From:** "Rick Snow" <RickSnow@amsolusa.com>
**Date:** Thu, 30 Mar 2006 08:53:43 -0500
**To:** "maggic" <maggic@prodigy.net>

Ownership is being discussed with attorneys who do this sort of thing all the time. My initial intention in establishing a new contracting entity/entities was to separate the past from the future and I knew that the ownership had to be different enough—and the real ability to make decisions had to be different enough—to build a firewall between AmSol and AIM. The attorneys have confirmed this (and much to everyone's amazement, were very impressed with the structure I had set up—a prophet is without honor when there's no profit or something like that...) and are now looking at AIM, AIM Consulting Services, AIM Management Ventures, AIM Physician Ventures, AIM Recruiting Services and how to give managers/directors incentives that directly correlate to the success of their efforts in these different sub-entities, which must still serve as flow-through mechanisms to get cash to AIM and then compensate AmSol for the services it provides to AIM (under a written service agreement which has already been done). All this and still make revenue stick where you want it to stick and flow when you need for it to flow. I know how it all works in my mind but you know attorneys—they view this as something they didn't think of themselves so they want to "make improvements" to prove how much smarter they are and do so by utilizing enough billable hours to line their own freakin' pockets. Cynical? You bet—I've worked that side of the street with some of the best and I know how it works.

But, to answer your question, ownership in AIM is limited to one person right now and it ain't you or me. Clearly, in order for the firewall to work and prevent any allegations of "alter ego" and subsequent "piercing of the corporate maidenhead," the ownership has to be varied from AmSol but, by the same token, it has to have a different decision-making structure than Amsol. In both, what Jim Cottrell wants goes unchallenged because no one else has a vote. That's okay and can remain exactly that way just so long as we don't worry about AmSol/AIM being kept separately and operated as different entities. For very real reasons of finances—the exorbitant lease for this vast office space we occupy (thank you SO much, Jim Weeks!) and what we have to pay to Weeks monthly—we're not making any money, cash is incredibly tight and it is very difficult to make valid business decisions in this environment. The lease obligation belongs to AmSol. The payment to Weeks obligation belongs to AmSol. Although we are working diligently to find a way to either renegotiate our lease (met with Liberty Property Trust rep yesterday and told him we need relief come July when it jumps up big time) or have someone sublet a substantial amount or all of the space (I've met with two different commercial brokerage firms about them taking the task on), I need to also lay the groundwork for Plan B (as in Bankruptcy and reorganization under Chapter 7). Part of that is to consider migrating desirable business with a future to AIM so that the contracts would not be in jeopardy if we did file (filing for bankruptcy is a material breach of the agreements that provides for immediate termination). Are there risks inherent in that process? You bet, which is why I am digging and delving into the legal impact that might have: i.e., would the courts recognize such a move as a sham transaction undertaken to avoid financial responsibilities to valid creditors.

[Damn, I'm glad you're a lawyer! It makes this discussion so much easier than it would otherwise be with a lay person.]

All of the above to say, I'm working on it. Of course, none of the above is for publication to anyone for any reason. Right now, the only company that makes any money is AmSol and that's where all the expenses reside as well. Like you, I am not particularly enamored with the idea of my ownership percentage of Amsol being made worthless nor do I believe that will be the end result. I am taking a very aggressive posture as regards what we pay Weeks under the Liquidation Agreement and pushing for resolution of those contractual issues that would have an impact on the amount we pay him for his share of AmSol going forward. I am pushing aggressively an cost control here in the company on a continuous basis and monitor individual's expense reports, following up with very direct questions when I think the benefit to AmSol for an expenditure seems less-than-clear. There have been reductions in personnel in the past and there might very well be more in the not-too-distant future. I will not, however, cut positions that I view as essential to the level of service we provide to our clients. There might be better ways of providing those services or less expensive ways of doing so and I am investigating those possibilities as well.

It's a very busy time for all concerned. I'd be happy to talk about any or all of this if you so desire.

ownership

Rick

Rick Snow
Chief Executive Officer
AmSol, LLC

**From:** maggic [mailto:maggic@prodigy.net]
**Sent:** Thursday, March 30, 2006 6:34 AM
**To:** Rick Snow
**Subject:** Re: Anesthesia

Rick

understand,,, by the way who are the owners of AIM??? I have not seen any paper work regarding the initiation...

Joe

Rick Snow wrote:

Part of the particular desire to play that card has to do with the long-term effect the loss of that particular contract from the AmSol perspective would have to do with what we end up by way of dollars expended in setting up with Weeks over the long run. If, for instance, we were to approach a NEW contract with her from the perspective of AIM Management Ventures, well, you get my drift.

Always trying to maximize the benefit to our company.

Rick Snow
Chief Executive Officer
AmSol, LLC

-----Original Message-----
From: maggic [mailto:maggic@prodigy.net]
Sent: Wednesday, March 29, 2006 5:26 PM
To: Rick Snow
Subject: Re: Anesthesia

Rick